UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN LANGDON, as the Personal
Representative of the Estate of CALISTA
SPRINGER, deceased,

        Plaintiff,

                                                  File No. 1:10-cv-985

v.

                                                  HON. ROBERT HOLMES BELL

PATRICIA SKELDING, CYNTHIA BARE,
MARIANNA UDOW, LAURA CHAMPAGNE
and TED FORREST, jointly and severally,

        Defendants.
_____/

## **O P I N I O N**

On October 7, 2010, Plaintiff Susan Langdon, grandmother of the deceased Calista Springer, filed this action for money damages under 42 U.S.C. § 1983 as Personal Representative of Calista Springer's estate. This matter is before the Court on Defendants' motion to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c). (Dkt. No. 10.) For the reasons that follow, Defendants' motion to dismiss will be granted.

**I.**

The circumstances of this case are nothing short of tragic. Calista Springer died of asphyxia by products of combustion on February 27, 2008, when her home caught fire. She was seventeen years old. Calista was restrained to her bunk bed by a chain fitted around her waist and affixed to the bed frame with plastic ties, rendering her unable to escape smoke and flames. Calista's father and stepmother had been restraining Calista at night for years,

purportedly because Calista was prone to wandering, theft, and erratic behavior.

Plaintiff alleges that Calista suffered from a long history of abuse at the hand of her parents, and that a series of complaints between 1995 and 2005 alerted Child Protective Services ("CPS") to Calista's abusive situation. (Dkt. No. 15 at 6-9.) Plaintiff refers to CPS records documenting complaints made regarding Callista:

> May 5, 1997, Valerie Springer, Calista's aunt, reported that Calista had a bloody lip.
> June 8, 1997, Valerie Springer reported that Calista had a burn on thumb and ring finger that had remained untreated despite infection.
> May 24, 1999, David Wingard, a social worker with the wraparound program (providing assistance for youth with severe emotional and behavioral problems) reported that Calista was being restrained to her bed at night.
> May 18, 2000, School Counselor Deb Mathis reported that Calista had a bruise on her cheek and claimed that her father kicked her. Mathis also reported that Calista complained of being locked in her bedroom at night.
> September 19, 2000, Deb Mathis again reported that Calista was being locked in her bedroom at night.
> August 22, 2001, CPS received an anonymous report stating that Calista was being mentally abused. Marsha Springer allegedly said that she would put Calista in foster care when she turns 12, but that she (Martha Springer) hopes that Calista dies before then.

(Dkt. No. 15-1 at 6-7; Dkt. No. 15-3, Pl. Ex. 2-6.) CPS declined to take action on any of the above reports. In most of these instances, CPS workers made follow up phone calls or visits and did not find that Calista had been harmed. Letters indicating CPS' decision not to take action were generally sent to the sources of the complaints.

On October 29, 2004, Callista's teacher, Diana Balyeat, reported to CPS that Calista was being chained to her bed at night. On the same day, Beth Granger, a neighbor, reported to CPS that Calista had told her that she was being chained at night, that she had not eaten

2

except at school for two days, that Marsha Springer would not let her use toothpaste or deodorant, and that Marsha Springer was physically abusive. On November 8, 2004, Balyeat filed another report, this time reporting a black eye and relaying Calista's claim that her stepmother forced her to lie on the floor, pulled her head up by the hair, and then let her head drop back to the floor. Unlike the previous complaints, these reports were assigned to CPS Investigator Patricia Skelding for an investigation.

In the course of her investigation, Defendant Skelding interviewed Callista's stepsisters Heather and Courtney on October 29, 2004. She spoke with Sheila Schill, a CPS worker who had background information on prior complaints concerning Calista. She spoke with Calista and again with her two stepsisters at the girls' school. And, finally, Defendant Skelding interviewed Martha and Anthony Springer for some length at their home on November 9, 2004. (Dkt. No. 15-3, at Page ID#154.) Plaintiff alleges that Calista asked Defendant Skelding to convince Martha and Anthony Springer that restraining Calista at night was no longer necessary. Plaintiff also alleges that Defendant Skelding warned Callista's parents about the danger of "underestimating the power of a fire." (Dkt. No. 15-1 at 8.)

Despite misgivings concerning Calista's home environment, Defendant Skelding concluded in her investigation report that there was not sufficient evidence to prove neglect or abuse. (Dkt. No. 15-3, Page ID#168.)

> I am very uncomfortable with the way Calista is being treated and targeted.
> I can only hope that it really is necessary and for her own protection. I

3

> tried to talk Marsha into letting Calista have a tooth brush and toothpaste supervised. It seemed to mean a lot to Calista. Marsha said no. Calista was adamant about Marsha pulling her hair. Calista repeated this incident several times. Calista said that her sisters were not there when it happened. Calista is known to make up stories and she is not credible. It ends up that it is her word against Marsha's word. I couldn't tell by looking at the crown of her head that hair was missing . . . The parents use a device to tie Calista in her bed. Anthony said that it is the same device used in adult nursing homes that alert staff when adults get out of bed and roam around. Courtney and Heather say that they have not seen their mother, Marsha, hit Calista, pull her hair or be mean to her in any way. They say that their mother is very patient with Calista. There was insufficient evidence to prove neglect or abuse.

(*Id* at Page ID#167-68.) In a handwritten statement added to the end of the report, Defendant Skelding also stated: "Calista is a vulnerable child. Because she is not believable or credible, she would also be an easy target to abuse her. I think we need to check out all complaints regarding her. . . ."

Defendant Skelding's supervisor, Defendant Bare, agreed that the investigation had not yielded sufficient evidence to establish neglect or abuse, and the case was closed. After the 2004 investigation, CPS received one additional complaint regarding Calista on June 3, 2005. Deb Stauffer, the mother of one of Calista's classmates, reported that Calista had told her that was being chained to her bed, is forced to wear the same clothes for days, and is sometimes hit with a board for punishment. CPS did not take additional action. Calista died on February 27, 2008, nearly three years after the last complaint made to CPS.

## II.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a

complaint. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). In reviewing the motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).

**III.**

Plaintiff alleges that Defendants Skelding and Bare failed to adequately investigate and act upon reports that Calista Springer was being abused, and that Calista died as result. In order to state a cause of action under 42 U.S.C. §1983, Plaintiff must establish that she was deprived of a federal right, and that the persons who deprived her of that right acted under color of state law. *West v. Adkins*, 487 U.S. 42, 48 (1988). Plaintiff claims that Defendants violated her substantive and procedural due process rights.[1]

---

[1] If read expansively, Plaintiff's complaint creates some confusion as to whether other potential grounds for § 1983 liability are alleged. Specifically, the complaint references in passing the equal protection clause (Dkt. No. 1 at ¶¶ 62, 79), and the Federal Adoption Assistance and Child Welfare Act of 1980 ("FAACWA") (*Id.* at ¶ 16). However, the complaint does not present any allegations of disparate treatment which might support an equal protection claim, nor does it specify which provisions of the FAACWA Defendants may have violated. Most significantly, Plaintiffs did not defend or even address equal protection or the FAACWA either in her brief or at oral argument in response to Defendants' motion for summary judgment. Accordingly, the Court finds that Plaintiff did not intend to put forth either as a basis for her § 1983 action.

**A. Substantive Due Process**

The Due Process clause does not obligate the state to protect individuals from private violence. This was conclusively established in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), where the state was held not liable for injuries to a child at the hands of his father, even though the state had previously taken custody of the child and had received reports of continuing abuse after returning the child to his father.

Plaintiff does not dispute the established rule, but relies on the "state-created danger" exception to *DeShaney*. Under this theory, Plaintiff must meet a high burden in showing (1) an affirmative act by the state which either created or increased the risk that the Plaintiff would be exposed to danger, (2) that the state's actions placed the plaintiff specifically at risk, and (3) that the culpability of the state "shocks the conscience." *Kallstron v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998); *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002).

Plaintiff claims that Defendants' failure to take corrective action despite their knowledge that Calista was being chained to her bed at night encouraged Calista's parents to continue the practice, thereby placing Calista in heightened danger. Specifically, Plaintiff claims that Defendant Skelding warned Martha and Anthony Springer about the "dangers of fire" associated with chaining Calista, and that the lack of any corrective action by CPS in the wake of that warning constituted an "unequivocal endorsement." (Dkt. No. 15-1 at 22.)

The Court accepts as true all of Plaintiff's factual allegations, including her contention

6

that Defendants were fully aware of the Springers' long-standing practice of chaining Calista, and that Defendant Skelding warned the Springers of fire safety concerns during her 2004 investigation. However, the Court must conclude that Plaintiff has failed to identify any "affirmative act" by Defendants increasing Calista's risk of harm.

Even assuming that a warning *against* a certain behavior can constitute an endorsement under some circumstances, there is no indication that Defendant Skelding's comment or any other CPS action had any impact on the Springers' practice of chaining Calista at night. It is undisputed that the Springers had been chaining Calista to her bed for many years prior to Defendant Skelding's investigation. The earliest complaint cited by Plaintiff regarding the practice occurred in 1999, some five years before Defendant Skelding's investigation. The practice apparently continued for years after the investigation, up until Calista's death in 2008. Plaintiff has provided no grounds for assuming that Defendant Skelding's warning against the danger fire or CPS' failure to take forceful action somehow induced the Springers to persist in a practice which had been ongoing for many years. Outrage that CPS did nothing to end the process is not enough.

Calista was in danger before Defendant Skelding's investigation. Calista continued to face the exact same danger afterward. Ultimately, Calista died from that danger. But it cannot be said that Defendants took any "affirmative" action, let alone one which created or increased the danger which lead to this tragedy.

### B. Procedural Due Process

Plaintiff also claims violation of procedural due process as a basis for her § 1983 claim. To establish a violation of procedural due process, "a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).

State-created liberty interests arise when a state places "substantive limitations on official discretion." *"Tony" L. and "Joey" L. v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995) (citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)). Such substantive limits on official discretion require the establishment of "substantive predicates" to govern official decision-making, as well as a mandated "outcome to be reached upon a finding that the relevant criteria have been met." *Id.* "The state statutes or regulations . . . must use 'explicitly mandatory language' requiring a particular outcome if the articulated substantive predicates are present." *Id.*

Plaintiff argues that Defendants violated Calista's procedural due process rights by failing to file a petition in the family division of the circuit court. Under Michigan law, CPS is required to submit a petition to the circuit court when "[t]he department determines that a parent . . . has abused the child . . . and the abuse included . . . battering, torture, or other severe physical abuse." MCL 722.638 (1)(a)(iii). Plaintiff argues that, because this law

8

requires CPS to file a petition under certain circumstances, it creates a liberty interest under the due process clause. Plaintiff further argues that Defendants knew that Calista was being tortured based on the documented complaints regarding Calista, that Defendants' failure to file a petition in the Michigan courts was therefore a violation of the mandatory requirements of MCL 722.638, and that this failure to follow statutory requirements was a violation of Plaintiff's due process rights. (Dkt. No. 15 at 16-18.)

As an initial matter, the facts as alleged by Plaintiff do not show that the predicate conditions requiring a mandatory petition under MCL 722.638 were met. The law only requires CPS to file a petition in the circuit court if the department itself makes a finding that a child has been abused and that the abuse amounts to battering, torture, or other severe physical abuse. Plaintiff does not allege that Defendants ever made any such determination. Even accepting as true Plaintiff's allegation that Calista was in fact being abused by her parents and that chaining Calista to her bed constituted torture, the statute commits these determinations to the discretion of the agency. Defendants maintain, and Plaintiff does not challenge, that CPS never found that Calista was being abused, let alone tortured.

Alternatively, even if Defendants were statutorily obligated to file a petition in circuit court, the statutory requirement would not provide Plaintiff a liberty interest under the due process clause because MCL 722.638 does not mandate a particular substantive outcome. "Courts distinguish between an expectation of process and an expectation of a particular substantive result. Only if a particular substantive result is mandated will a state-created

9

liberty interest exist." *Reese v. Peiss, et al.*, Case No. 2:11-cv-10208, slip op. at 11 (E.D. Mich. Sept. 20, 2011) (citing *"Tony" L. and "Joey" L.*, 71 F.3d at 1185-86. ("The claim of a state-created liberty interest fails, however, because no particular substantive outcome is mandated. The requirement that an investigation be initiated only gives Plaintiffs an expectation of receiving a certain process."). Although MCL 722.638 uses mandatory language, it only requires that a certain procedure be followed. It clearly does not guarantee any substantive result; any number of conceivable outcomes might follow from a petition in circuit court. This kind of non-substantive benefit, even if ostensibly mandatory, is not a protected entitlement under the due process clause. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 56 (2005) ("The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit.'")

**C. Qualified Immunity**

The Defendants in this case are Michigan officials being sued in their individual capacities. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Claims of immunity are thus to be analyzed 'on a fact-specific, case-by-base basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful.'" *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997). It is plaintiff's burden to prove that no reasonable person

in any of the defendants' positions would have reasonably believed their conduct was lawful based upon pre-existing law. *Id.* at 459.

The Court finds that Plaintiff has failed to allege a violation of federal law which could support her § 1983 claim. However, even had the Court determined that Plaintiff's due process rights had been violated, the Court would still dismiss this matter on grounds of qualified immunity. Plaintiff produced no legal authority definitively showing that her allegations fall within the scope of substantive or procedural due process. Because reasonable persons acting in Defendants' positions could have believed that their conduct was lawful, Defendants are entitled to qualified immunity.

## IV.

The Court was saddened by this case, and is sympathetic to Plaintiff's grievances. Indeed, CPS' handling of Calista Springer's case was less than exemplary, even considering the many inherent difficulties of CPS' mandate. However, Plaintiff has not carried her burden in alleging a viable claim of substantive or procedural due process. Furthermore, Defendants are entitled to qualified immunity. Accordingly, Defendants' motion to dismiss Plaintiff's complaint will be granted. An order consistent with this opinion will be ordered.


Dated: September 30, 2011         /s/ Robert Holmes Bell
                                  ROBERT HOLMES BELL
                                  UNITED STATES DISTRICT JUDGE